## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) MODOC NATION a/k/a MODOC TRIBE OF OKLAHOMA and (2) RED CEDAR ENTERPRISES, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 19-cv-00588-CVE-JFJ |
| (1) RAJESH SHAH, (2) SHARAD DADBHAWALA, (3) RUSTY BOHL, (4) SOFTEK MANAGEMENT SERVICES, LLC, (5) SOFTEK FEDERAL SERVICES, LLC, and (6) SOFTEK SOLUTIONS, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs, Modoc Nation, f/k/a Modoc Tribe of Oklahoma, ("Modoc Tribe" or "Tribe") and Red Cedar Enterprises, Inc. ("Red Cedar"), for their Complaint and Jury Demand against Defendants Rajesh Shah, Sharad Dadbhawala, Rusty Bohl, Softek Management Services, LLC, Softek Federal Services, LLC and Softek Solutions, Inc, hereby allege as follows:

### INTRODUCTION

1.     This case arises out of a sophisticated conspiracy, scheme and fraudulent course of conduct from 2010 through July 2019 orchestrated by Defendants Rajesh Shah ("Rajesh"), Sharad Dadbhawala ("Sharad") and Rusty Bohl ("Rusty") to defraud and deceive the Modoc Tribe and Red Cedar of profits, fees, salaries. loans, interest and other payments Defendants fraudulently paid to themselves of more than $13.5 million dollars.

2. Defendants teamed up in 2010 after a dispute with and termination of Yash Technologies' investment in Suh'dutsing Technologies, an 8(a) disadvantaged government contracting entity of the Cedar Band of the Paiute Tribe in Utah, which Rajesh managed as Chief Operating Officer for the benefit of Yash Technologies.

3. Defendants launched this fraudulent scheme after the fallout with the Paiute Tribe and convinced the Modoc's Chief and Tribal Council that Softek was  a consortium of companies that were uniquely situated and experienced to successfully invest in, finance and manage Red Cedar and form, invest in, manage and finance other Modoc Tribal entities ("MTE's") Defendants would qualify with the SBA as 8(a) economically disadvantaged companies and procure lucrative government and commercial contracts from which the Modoc Tribe would reap substantial profits.

4. Defendants implemented their scheme, conspiracy and fraudulent course of conduct by entering into a number of agreements with the Modoc Tribe and Red Cedar by which from January 2011 through July 2019 they fraudulently invoiced, accrued and paid themselves fees of more than $11.0 million dollars from tribal profits.

5. The Modoc Tribe began discovering Defendants' fraudulent scheme in July 2019 and terminated the agreements and Defendants' employment. The Tribe's investigation has continued since July and is continuing to unravel and discover the extent of Defendants' conspiracy and scheme to defraud the Tribe and Red Cedar.

6. The Modoc Tribe and Red Cedar now bring this action to recover not less than $8.0 million dollars of fees they so far have discovered these Defendants fraudulently invoiced and accrued as fees and paid to themselves to the detriment of the Tribe and Red Cedar, another $5.0 million of loan losses the Tribe has so far discovered that it has suffered as a result of Defendants' fraud as well as almost $1.0 million dollars of forfeitable salaries they paid themselves.

## PARTIES

7. Plaintiff Modoc Nation, a/k/a the Modoc Tribe of Oklahoma ("Modocs" and "Tribe") is a federally recognized Indian tribe organized under the Oklahoma Indian Welfare Act of 1936, Title 25 U.S.C. Section 5203 and incorporated as a non-profit corporation under Oklahoma law for the welfare and benefit of its impoverished tribal members. The Tribe maintains its offices and headquarters within the Northern District of Oklahoma in Miami, Oklahoma.

8. Plaintiff Red Cedar is a wholly owned corporation of the Tribe chartered under the Modoc Tribe's Constitution and laws. Red Cedar maintains its office and headquarters within the Northern District of Oklahoma in Miami, Oklahoma. SBA qualified it as a Title 8(a) company in 2005.

9. Defendant Rajesh Shah ("Rajesh"), the mastermind of the scheme, is a permanent U.S. resident and citizen of India who resides in Union City, CA.

10. Defendant Sharad Dadbhawala ("Sharad") is a citizen of India who resides in Campbell, CA.

11. Defendant Rusty Bohl ("Rusty") is a U.S. citizen who resides in Flower Mound, TX.

12. Defendants Softek Management Services, LLC ("SMS"), Softek Federal Services, LLC ("SFS"), Softek Solutions, Inc. ("SS") and Softek Global Services, LLC ("SGS") are California companies formed under California law (collectively referred to as "Softek"). Rajesh, a California resident, is the sole member and manager of SMS and SFS, All three corporations maintain their principal place of business at 39899 Balentine Dr., Suite 190, Newark, CA 94560.

13. Rajesh is and, at all times was, the founder, owner, managing member, and/or chief executive officer of SMS, SFS and SS to which he refers to collectively as Softek. Rajesh was

also employed as Red Cedar's Chief Executive Officer from June 2011 through November 2012 when the SBA denied approval of Rajesh as CEO.

14.     Sharad is and, at all times was, the CFO and/or Chief Accounting Officer of SMS, SFS and SS to which he refers to collectively as Softek.  He also acted as the *de facto* chief accounting officer of Red Cedar and other MTEs.

15.     Rusty was a manager and employee of SMS which he also refers to as Softek.  He also became a salaried employee of Red Cedar in 2014 and continued until the Tribe discovered his betrayal of Red Cedar and fraud on the Tribe.  Rusty falsely held himself out from 2011 to July 2019 to Red Cedar and MTE employees as the Tribe's authorized representative and the tribal representative from whom they should take directions and to whom they should report.

16.      Rusty proved his *mala fides* when, after his termination, he immediately committed spoliation of relevant evidence.  He removed from his office computer all electronic data evidencing his communications with his co-conspirators and fraudulent course of conduct in which he participated from 2010 through July 2019.

17.     Defendants were motivated and profitably participated in this conspiracy, scheme to defraud, and fraudulent course of conduct because they shared in the millions of dollars of fraudulent fees and salaries that they fraudulently derived from the fraud, scheme and conspiracy.

<h2 align="center">JURISDICTION AND VENUE</h2>

18.     This court has original jurisdiction of this action pursuant to 28 U.S.C. §1332 because the controversy is between citizens of different states and foreign subjects and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19.     This court has venue of this action pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the events and omissions giving rise to this action and claim occurred in Miami, Oklahoma within this District.

### DEFENDANTS' CONSPIRACY, SCHEME AND FRAUDULENT COURSE OF CONDUCT

21.     From 2006 to 2010 Defendants were working with Yash Technologies and Manoi Bahoti, Yash's owner and a close associate of Rajesh, who invested in Suh'dutsing to provide financing and management to Suh'dutsing in return for a percentage of profits.  Bahoti designated Rajesh to serve as the COO of Suh'dutsting, and Rajesh managed and controlled its operations for Bahoti's benefit.

22.     Defendants' services ended abruptly in 2010 and a lawsuit was filed in 2011 between Yash Technologies and Suh'dutsing that triggered claims and counterclaims which Yash Technologies confidentially settled in 2013 to prevent disclosure.

23.     Defendants decided in 2010 when they were terminated to team up to create Softek and with Mahoi Bahoti's silent backing to approach the Modoc Tribe and propose that Defendants invest in, manage and finance Red Cedar, the Modoc's 8(a) company, and form a network of other MTE's that Defendants would qualify as 8(a) companies to secure government and commercial contracting business from which Defendants could derive enormous personal profit.

24.     Rusty was familiar with the Modoc Tribe and Red Cedar's 8(a) company from his wife's engagement as the Tribe's auditor since 2001 and from Rusty's efforts in 2005 to partner with Red Cedar to develop construction projects through RKS Solutions, Inc. ("RKS"), a consulting company owned by Rusty, and through which as alleged below he defrauded the Tribe and Red Cedar by fraudulent invoicing Red Cedar to pay RKS purported development fees.

25.    Rusty met with the Tribe in July 2010 and reminded the Tribe that he had managed and developed lucrative contracting business for the Wyandott Tribe through its tribally owned 8(a) companies.  The Wyandott Tribe is headquartered in Miami, Oklahoma and was well known to the Modocs as having successful 8(a) contracting businesses.

26.    Rusty pitched the Modocs with Defendants' proposal that Softek would invest in Red Cedar and provide management, financing and business development services to expand Red Cedar's 8(a) business and, in addition, would form, invest in, manage and finance other new MTE's and qualify them as 8(a) companies to enter into profitable government and commercial contracts.

27.    The Tribe expressed interest in Rusty's proposal and Rusty quickly introduced the Modocs to his fellow Softek team members and co-conspirators, Rajesh and Sharad. Defendants drafted and SS signed a Letter of Intent, dated August 16, 2010, with the Modoc Tribe proposing that Softek purchase a 49% interest in Red Cedar, share in 49% of its profits and receive a 40% management fee.

28.    From August to December 2010 Defendants scheduled and held several meetings at the Tribe's Miami Oklahoma office during which they falsely described what Softek had to offer and would provide to the Tribe, Red Cedar and the newly formed MTE's. Defendants did not disclose the terminations, dispute and litigation with the Paiute Tribe over Yash's investment and Rajesh's management of its 8(a) program.

29.    Rajesh described what the Softek consortium would provide to Red Cedar and the new MTE's:

a.    SMS, Softek's management consulting company, would provide Red Cedar and the new MTE's with all the management personnel and infrastructure

necessary to manage and develop the MTE businesses and procure government contracts;

b.      SFS, Softek's financial consulting company, would provide Red Cedar and the new MTE's with financing for all the working and operating capital necessary to operate their businesses and contracts; and

c.      SS, Softek's information technology ("IT") consulting company, would provide the information technology expertise to procure and perform government IT contracts.

30.    Rajesh's descriptions of the Softek consortium were utterly false:

a.      SMS did not exist in 2010.  Rajesh formed SMS in January 2011 with only Rajesh and Sharad as its employees.  It had no capital.  It had no experience in providing business management and development services to customers;

b.      SFS did not exist in 2010.  Rajesh formed SFS in January 2011 when he formed SMS.  SFS's only employees were Rajesh and Sharad.  SFS had no capital and no experience in extending credit and providing loans for working capital and financing businesses; and

c.      SS, although formed in 2003, only had Rajesh and Sharad as employees. SS had minimal capital and experience in providing IT consulting services.

31.    Defendants drafted several agreements which they and the Tribal Chief and Tribal members signed in December 2010:

a.      An ownership agreement by which SFS would purchase 49% of Red Cedar, signed by Rajesh for SFS on December 20, 2010 (before SFS existed);

b.      A profit-sharing-agreement by which SFS would split profits 51%/49% with the Tribe signed by Rajesh for SFS on December 20, 2010 (before SFS existed); and

c.      A corporate management services agreement ("Management Agreement") for SMS to provide management services to Red Cedar and other Modoc MTE's, signed by Rajesh for SMS on December 20, 2010 (before SMS existed).  SMS's management services would include providing executive officers, government contract officer services, government proposal, program, project and management services, general accounting services, tax services, and payroll services; and it provided that SMS would provide all funding to conduct Red Cedar's business and operations.

32.    Defendants included in the Management Agreement a provision that falsely assured the Modoc Tribe of their integrity and the transparency of SMS's management services:

a.      Defendants would design and operate a financial accounting and control system that would provide internal accounting controls in compliance with Sarbanes-Oxley;

b.      Defendants would maintain full and accurate books of account at Red Cedar's office;

c.      Defendants would provide monthly, quarterly and annual statements reporting all revenues, deductions and disbursements;

d.      Defendants would provide remote access to SMS's data base;

e.      Defendants would maintain the accounting records and prepare and issue financial statements in accordance with GAAP;

f.     Defendants would have the annual financial statements audited by a recognized firm; and

g.     Defendants would provide reports to show SMS's "amounts of profit distributions," and would issue reports "clearly showing the calculation and payment of the managers' fee."

33.     Defendants' assurances were false.  Defendants never intended to and didn't carry out any of the assurances other than having Rusty's wife audit the MTE's financial statements.

34.     In January 2011, because SMS had no management personnel to provide the sundry management services under the agreement, Rajesh began hiring personnel to provide the promised management services.  To that end, during the next few months SMS employed the following:

a.     A CFO (Sharard) to design and provide the financial accounting and control and reporting system for RCE;

b.     A COO to oversee the marketing and business development for RCE's government contracting business;

c.     A Director (Rusty) of construction contracting;

d.     A  V.P. of government contracting;

e.     A V.P. of government IT contracting;

f.     A Director  of accounting, finance and operations;

g.     An assistant for systems and administration support; and

h.     A Director of human resources.

35.     SMS contracted with vendors to handle SMS's payroll and fringe benefits programs.

36.    The December 2010 agreements between SMS and Red Cedar and SFS and the Tribe were subject to and effective only upon SBA approval.  The agreements were replaced when Rajesh determined that the SBA would not approve the agreements.

37.    To replace them, Rajesh represented and the Tribe agreed that for SMS's management and financing services, SMS would receive fees of 40% of Red Cedar's and the MTE's net profits for management, financing and business development services.

38.    In June, 2011 Rajesh became the CEO of Red Cedar.  Within six months Rajesh committed his first major breach of fiduciary duty and act of disloyalty by unilaterally adopting an "incentive plan" that Rajesh used from 2011 through 2014 to pay SMS not less than $1.2 million dollars more than the 40% fee to which SMS had agreed for managing and financing Red Cedar and the MTE's.

39.    From January 2012 through 2014, Defendants through SMS and RKS, falsely invoiced Red Cedar and the MTE's and falsely accrued management and development fees of more than $4.0 million dollars, which they fraudulently paid themselves when Red Cedar and the MTE's had no net profits.  Defendants' false invoices were issued by SMS and RKS.

## SMS'S MANAGEMENT AND FORMATION OF NEW MTE'S

40.    In January 2011, SMS took over the management of Red Cedar.

41.    In 2012, Red Cedar, although qualified as an 8(a), was not registered as an information technology ("IT") provider even though Defendants had falsely represented to the Tribe that they were experts and would expand Red Cedar's business into government IT business. Defendants did not know about the need for registration to bid for and procure government IT contracts.  They were informed of the need to do so by Bud Cool who said he could bid for an IT contract with the government on behalf of Red Cedar if it registered.

42.     After Red Cedar was registered, SMS hired Bud Cool as a consultant.  He prepared a bid and procured a $20.0 million dollar IT contract for Red Cedar, the first and by far largest contract of the kind Defendants had falsely represented they were experienced in procuring.

43.     Rajesh had Red Cedar, instead of for SMS, agree to pay Bud Cool a consulting commission of 20% of the profits on the contract.  Nevertheless as Rajesh was wont to do, he never paid the commission despite the fact that the contract was very profitable (but would have reduced Red Cedar's net profits from which SMS's fees were paid).

44.     In January 2012, Defendants caused Eagle to be formed as a wholly owned Modoc Tribal Enterprise.  Eagle was approved as an 8(a) and registered as an MTE to provide information technology services to government installations. Defendants falsely accrued and paid SMS fees from Eagle's profits.

45.     Eagle was not Defendants' idea.  It was the idea and based upon business plans prepared by Bud Cool and his partner Randy Muennink, who became the manager of Eagle.  Both were experienced information technology specialists.  Together, the two of them bid for, managed and developed all government IT contracts for all MTE's after 2012.

46.     In July 2012, Defendants caused Buffalo MTE to be formed to provide government construction services.  Buffalo was approved by the SBA as an 8(a) government contracting company on December 20, 2013. Defendants falsely accrued and paid SMS fees from Buffalo's profits.

47.     In November 2012, Defendants formed Talon.  Like Eagle, it was Bud Cool's and Randy Muennink's idea. They prepared the business plan for Talon to become an information technology hardware reseller.

11

48.     In 2013, the SBA denied 8(a) approval of Talon. It was dormant until Rajesh later revived it in 2014 to use as a conduit to transfer SMS's fees without disclosure or description in the MTE's financial statements and SMS's reports to the Tribe.

49.     Walga was formed in July 2015, and it was approved by the SBA as an 8(a) company.  Defendants falsely accrued and paid SMS fees from Walga's profits.

50.     Modoc MTE was formed in June 2014, and it was approved as an 8(a) company by the SBA.  Defendants falsely accrued and paid SMS fees from Modoc MTE's profits.

## SFS'S FINANCING OF THE MTE'S WORKING CAPITAL

51.     In February 2011, to show SFS's purported bona fides as a financial company, SFS issued and signed a non-recourse loan agreement with Red Cedar to extend up to $1.0 million of working capital to finance RCE's operations and projects.

52.     SFS had no capital for lending.  Softek borrowed funds for the loans from Boheti and investors with whom Rajesh had an established financial relationship.

53.     During 2011, SFS loaned Red Cedar working capital of $284,900; and in 2012 and 2013, SFS loaned Red Cedar an additional $725,000.  Defendants had Red Cedar repay $750,000 of the amount in 2013.

54.     Sometime in early 2015 Sharad took the loan off Red Cedar's books by backdating and creating a Note Payable to SFS on Talon's books for the balance of Red Cedar's loan to SFS. Sharad reflected Red Cedar's Note Payable as retired on its 2015 financial statements.

55.     SFS also entered into a non-recourse loan agreement with Eagle in March 2012 to extend up to $1.0 million for working capital and operating expenses.

56.     Upon Eagle's approval as an 8(a) company in 2013, SFS loaned Eagle approximately $860,000.  Sometime in early 2015, Sharad took the loan off Eagle's books by

backdating it to October 1, 2014 and creating a Note Payable to SFS on Talon's books for the balance of Eagle's loan.  Sharad reflected Eagle's Note Payable as retired on Eagle's financial statements.

57.     SFS entered into a non-recourse loan agreement with Buffalo in September 2012.

58.     After Buffalo's approval in 2013, SFS made one $80,000 loan to Buffalo. As with Red Cedar and Eagle, in early 2015 Sharad took the loan off Buffalo's books by backdating it and creating a Note Payable to SFS on Talon's books for the $80,000 balance of Buffalo's loan. Sharad reflected Buffalo's Note Payable as retired on its financial statements.

59.     SFS entered into a non-recourse loan agreement with Talon in November 2012. SFS made no loans to Talon because it was denied SBA approval.

60.     SFS never entered into non-recourse loan agreements with Walga or Modoc MTE because SMS and SFS had ceased financing the MTE's in 2013.

61.     Notwithstanding Sharad's retirement of the loans in 2015, Sharad issued a fraudulent demand in July 2019 that the Tribe pay Red Cedar's and Eagle's loan balances.

## IMPLEMENTATION OF INTER-COMPANY FINANCING TO REPLACE SFS FINANCING

62.     During 2013 and thereafter, Boheti and Softek's other investors upon which it relied for financing loans and credit to the MTE's stopped providing funds.  Consequently, Defendants stopped providing loans and financing to the MTE's.

63.     Rajesh and Sharad had become familiar with and schooled themselves on the government enterprise funds accounting the Tribe's auditor had adopted for the MTE's ("funds accounting").  Because they had stopped financing the MTE's, Defendants began using the funds accounting method to disguise and enable them to have the MTE's finance the working capital and

operating needs of the MTE's instead of having SFS finance the MTE's working capital and projects as Softek had agreed to do.

64.     The loans between the MTE's were accounted for as transfers on the MTE's books and in their financial statements instead of loans or amounts due to and due from the MTE's.

### RAJESH'S 2014 MANAGEMENT SERVICES AGREEMENT AND CREATION OF THE TALON FEE ACCOUNT TO TRANSFER UNDISCLOSED FEES TO SMS

65.     In 2014 Rajesh decided to secure a written management agreement with the Modoc Tribe.  Defendants drafted, and the Tribe and SMS signed, a Corporate Management Services Agreement ("Corporate Management Agreement") dated as of October 1, 2014.

66.     Rajesh drafted the Corporate Management Agreement in summary form to fraudulently represent and mislead the Tribe to believe that SMS would continue to provide the same business development and management services that SMS previously had provided, and that SFS would continue to arrange the same loans and extend credit to the MTE's for working capital and operating funds to finance the MTE's and their government contracting projects and business operations.  Rajesh's representations were utterly false.  The Tribe reasonably believing that Rajesh and Rusty who signed the agreement were honest reasonably believed the representations to be true.

67.     Relying on the fact that there were now four MTE's for SMS to manage and SFS to finance, Rajesh provided that for Softek's continued management and financing of the MTE's, the Tribe would be charged and pay two fees:

> a.     For its continued management of all of the MTE's, Rajesh provided that the Tribe would pay SMS 40% of each MTE's monthly net profits;

b.    For its continued extension of credit to the MTE's and loans for working capital, the Tribe would pay SMS 49% of the MTE's adjusted net profit.

68.    Defendants included an oblique reference in the agreement that SMS would use Talon as a Modoc Tribe Transfer account.

69.    Using the above reference in the agreement, Defendants immediately set up accounts payable to Talon on all the MTE's books to record SMS's fees; and they set up an account payable on Talon's books to record and pay SMS's fees.

70.    None of the accounts payable on the MTE's books accurately described the amounts due as SMS management and financing fees from profits.  Defendants falsely described them as fees for support and outside services, and they omitted disclosure of the fees on all the MTE's financial statements.

71.    Even worse and more deceptive, after October 1, 2014 SMS ceased issuing invoices to the MTE's for its management fees.  Instead, Defendants issued instructions to the accountants to enter false journal entries for SMS's fees and to wire funds to SMS as instructed.

72.    If worse can become worse, in early 2015 Sharad used the 40%/49% fee formula in the Management Agreement to retroactively accrue an additional $1.2 million of fees that Defendants fraudulently booked as due SMS for the management and financing of the MTE's from 2011 through September 30, 2014, when the fee agreement with the Tribe was 40% of net profits for management and financing the MTE's.

73.    By the time Defendants had the Tribe execute the Corporate Management Agreement on October 14, 2014, Defendants had already made changes so that SMS could charge the management and financing fees without providing management services and financing to the MTE's:

a.  Defendants had shifted Rusty and all of SMS's management and personnel who had performed business development, management and accounting services from SMS's payroll over to the MTE's payrolls;

b.  Rajesh and Sharad had ceased active participation in the management of the MTE's and their business development activities of the MTE's, and Rusty had become a salaried  employee of Red Cedar;

c.  Defendants had implemented the fund accounting method of financing the MTE's that relieved SFS of the risk, burden and obligation of providing loans to and financing the working capital needs of the MTE's;

d.  Defendants had determined that no financial statements or reports would be required to be issued for Talon as a non-operating conduit and that the MTE's financial statements would be issued so they did not disclose loans and fees; and

e.  Rajesh had become Talon's CEO so he could control and manipulate the accrual, payment, receipt and non-disclosure of SMS's fees; and

f.  Rusty participated in his former wife's audits of the MTE's financial statements.

74.  Notwithstanding SMS's management changes from October 1, 2014 through July 2019, SMS fraudulently accrued and charged the MTE's monthly with management fee of 40% of the MTE's net profits for SMS's continued management of the MTE's and with the financing fee of 49% of the MTE's adjusted net profit for providing working capital and loans to the MTE's.

75.     As previously alleged, Defendants did not issue invoices after 2014 but, instead, Defendants issued instructions to make  false journal entries for SMS's purported fees and wire the fees to SMS's bank account.

76.     As a result of charging, instructing and paying to SMS from the MTE's accounts the above-referenced management and financing fees, which services were not provided, Defendants fraudulently paid themselves, through Talon, fraudulent and undisclosed fees of not less than $8 million dollars.

## SMS'S NON-REPORTING AND NON-DISCLOSURE OF FEES AND PROFITS

77.     Rajesh had represented to the Tribe in 2010, which he confirmed in a provision in SMS's December 2010 Management Agreement, that Defendants would be transparent and would provide the Tribe with reports that would show Softek's "amounts of profit distributions" and "clearly show the calculation and payment of SMS's fees."

78.     Rajesh's representations were false.

79.     Defendants never provided any such reports to the Tribe disclosing the calculation and amounts of profits and fees Defendants took out of the MTE's and transferred to and through Talon to themselves.

80.     The MTE's annual financial statements were prepared so that they did not disclose the calculation, amount and payment of SMS's fees and profits.

81.     From 2012 through 2019, Rajesh, Sharad and Rusty scheduled and held periodic meetings with the Tribe at its Miami office to report on the MTE's businesses and their government and commercial contracting projects.

82.     At these meetings, they would routinely provide the Tribe with summary reports, usually one page, that masked profitability of the businesses and contracts.  None of the reports disclosed SMS's fees and profits to Defendants.

## DISCOVERY OF DEFENDANTS' FRAUD IN 2019

83.     In 2015 Rusty requested that the Tribe secure, and the Tribe posted, a $5.0 million Certificate of Deposit to secure a $5.0 million line of credit (the "LOC") that Eagle could use to procure a $20.0 million FAA contract.  Rusty represented that the sole purpose of the LOC was to secure Eagle's performance of the contract.

84.     Eagle was not awarded the FAA contract.  Nevertheless, Defendants left the $5.0 million LOC in place.

85.     Even though SFS was contractually obligated to provide the MTE's with working capital, SFS was not doing so. Thus, in early 2018 Defendants convinced the Tribe to approve draws on the LOC first, because of the government shut down, and thereafter claiming the MTE's had cash flow difficulties because of temporary disruptions in contracts and government payments on them.

86.     Defendants promised that the draws would be repaid upon cessation of the temporary disruptions and the LOC would be restored to and maintained at $5.0 million.

87.     Thereafter, and for the next 15 months, Rusty and Rusty's brother Richie Bohl, who joined the conspiracy as a co-conspirator in 2015, requested draws on the LOC with promises that the draws would be repaid.  Some of the draws were repaid during 2018, but none during late 2018 and up to July 2019.

88.     In July 2019, the Tribe learned the draws had not been repaid and Eagle's $5.0 million LOC had been depleted by Defendants' transfers of funds to other MTE's to finance their working capital needs.

89.     As a result of Defendants' depletion of the $5.0 million LOC, the Tribe had to apply the $5.0 Certificate of Deposit posted as security to repay the LOC and, as a result, the Tribe incurred a $5.0 million loss.

90.     Upon discovery of the depleted LOC in July 2019, the Tribe terminated the Corporate Management Agreement, terminated the employment of Rusty and his brother Richie, and commenced an investigation into Defendants' purported management and financing of the MTE's and the fees and profits they charged for management and financing.

91.     The Modoc Tribe learned from the investigation that the Defendants had defrauded the Tribe of not less than $8.0 million SMS paid to itself in fees and profits.

92.     The Tribe brings this action against Defendants to recover not less than $13.0 million of fees, losses and damages caused by Defendants' perpetration of the conspiracy and scheme to defraud and deceive it.

## FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
### (CONSPIRACY TO DEFRAUD)

93.     Plaintiffs repeat their allegations in Paragraphs 1 through 92.

94.     Defendants combined, conspired and agreed with each other to defraud and deceive Plaintiffs by entering into fraudulent agreements by which, through SMS and SFS, they fraudulently promised and agreed that they would provide management, business development and financing services      in return for management and financing fees.

95.     Defendants performed the following overt acts to further their conspiracy and accomplish their unlawful and fraudulent objective of defrauding and deceiving Plaintiffs:

19

a.  In August 2010, SS signed a Letter of Intent that falsely represented that Defendants had a consortium of companies that could provide the Tribe's MTE's with management and business development services and finance the MTE's working capital and operations;

b.  In December 2010, SMS signed a Management Agreement with Red Cedar that falsely represented the management, business development and other services that SMS would provide to Red Cedar and the MTE's;

c.  In 2011, Rajesh drafted and Sharad implemented an incentive plan effective October 1, 2011 to fraudulent pay 32% of net profits to SMS;

d.  During 2012 through 2014, Defendants accrued and issued false monthly invoices to Red Cedar, Eagle, and Buffalo for fees;

e.  In October 2014, SMS signed a Corporate Management Services Agreement with the Tribe that falsely represented that SMS would continue providing management and financing services;

f.  In October 2014, Defendants created accounts payable to Talon on the MTE's books by which they transferred SMS's fraudulent management and financing fees that were falsely described as support and outside services;

g.  In early 2015, Sharad retired Red Cedar's, Eagle's and Buffalo's notes payable to SFS by backdating and creating notes payable on Talon's books for the loan;

h.  During 2014 to July 2019, Defendants issued false instructions to journal entries for fees due SMS and to wire fees to SMS; and

i.      From 2011 to July 2019, Defendants provided periodic reports that concealed from the Tribe the description, calculation and amount of management and financing fees and profits SMS was paying itself.

96.     Defendants accomplished the object of their conspiracy and defrauded and deceived Plaintiffs by fraudulently paying themselves more than $8.5 million of fees.

## SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
## (FRAUD AND MISREPRESENTATION)

97.     Plaintiffs repeat their allegations in Paragraphs 1 through 96.

98.     Defendants made false and misleading statements and misrepresentations of material facts to Plaintiffs that they had a consortium of companies through which they could and would provide the MTE's with management and business development services and with loans to finance the working capital and operating needs of the MTE's on an ongoing basis.

99.     Defendants drafted and executed agreements in which they made false and misleading statements and misrepresentation of material facts to the Tribe that they were continuing to provide the Tribe's MTE's with management and business development services and were continuing to provide loans and financing for the MTE's working capital and operating needs. The Tribe relied upon the false and misleading statements to executed the 2014 Management Services Agreement.

100.    Defendants issued monthly materially false invoices during 2012 through 2014 that fabricated fees for SMS's and RKS's purported fees that were fraudulently accrued and the fees were paid to SMS and RKS in reliance upon the invoices.

101.    Defendants issued fraudulent instructions during 2015 through July 2019 to enter false journal entries for fees due SMS on the MTE's books and to wire millions of dollars of funds

to SMS from the MTE's accounts and the fees were paid to SMS in reliance upon the fraudulent instructions and false entries.

102.    Defendants issued periodic reports and met with the Tribe where they falsely represented material facts about the profitability of the MTE's businesses and projects and falsely concealed material facts about the fees that SMS was paying itself for managing and financing the MTE's. Defendants' representations in July were discovered to be false and material to the very purpose and goal of the Plaintiffs' agreements with Defendants.

103.    Defendants' false statements, misstatements and misrepresentations of material facts were fraudulent, false and misleading and they fraudulently withheld and did not disclose material facts and information that would have revealed that Defendants' statements and representations were fraudulent, false and misleading.

104.    Defendants knew their statements and representations were fraudulent, false and misleading and made them knowingly, intentionally and recklessly and with utter disregard for the truth as manifest from the duration and number of false statements made and fraudulent actions perpetrated by the Defendants and Defendants' cover up and concealment of the truth which they were obligated by law and contract to disclose to Plaintiffs

105.    Defendants made the fraudulent, false and misleading representations and omissions with the intention that the Plaintiffs would reasonably rely and act upon said representations.

106.    Plaintiffs reasonably and detrimentally relied and acted in reliance upon Defendants' fraudulent, false and misleading statements and omissions.

107.    Defendants' fraudulent, false and misleading statements and omission have caused Plaintiffs to suffer injury, damages and losses of not less than $13.5 million dollars.

## THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
### (DECEIT)

108.    Plaintiffs repeat their allegations in Paragraphs 1 through 107.

109.    Defendants made deceitful and deceptive suggestions and statements of material facts which were not true.

110.    Defendants knew their deceitful and deceptive suggestions and statements of material fact were not true and they had no reasonable grounds for believing that such deceitful and deceptive suggestions and statements were true.

111.    Plaintiffs reasonably and justifiably relied upon and trusted Defendants to be honest and truthful and to provide Plaintiffs with honest and truthful facts.

112.    Defendants knew that Plaintiffs trusted them and were reasonably and justifiably relying upon Defendants to make honest and truthful statements.

113.    Defendants' deceit has caused Plaintiffs to suffer injury, damages and losses of not less than $13.5 million dollars.

## FOURTH CLAIM FOR RELIEF AGAINST SMS
### (BREACH OF CONTRACT)

114.    Plaintiffs repeat their allegations in Paragraphs 1 through 113.

115.    SMS entered into a Management Agreement with Red Cedar on December 10, 2010 and a Corporate Management Agreement with the Modoc Tribe as of October 1, 2014.

116.    SMS breached the agreements by paying itself fees and excessively reimbursing itself for overhead, payroll and other expenses in violation of the terms of the agreements.

117.    The Modoc Tribe and Red Cedar suffered injury, loss and damages as a proximate cause of the breaches of the agreements of not less than $8.0 million dollars.

## FIFTH CLAIM FOR RELIEF AGAINST RAJESH AND RUSTY
### (BREACH OF FIDUCIARY DUTY)

23

118.    Plaintiffs repeat their allegations in Paragraphs 1 through 117.

119.    Defendant Rajesh was appointed to become CEO of Red Cedar in June 2011 and served in that capacity until November 2012. During his tenure Red Cedar paid Rajesh an annual $185,000 salary.

120.    Defendant Rusty Bohl was employed by Red Cedar from early 2014 until he was terminated in July 2019.  Red Cedar paid Rusty an annual salary of $100,000.

121.    During his tenure as CEO of Red Cedar, Rajesh adopted an incentive plan in November 2011 to have Red Cedar pay SMS not less than $1.2 million dollars from 2012 through 2014.

122.    Rajesh's adoption of the incentive plan was self-serving and violated his fiduciary duties of candor, care and loyalty to Red Cedar.

123.    Rajesh's and Rusty's fraud and deceit as employees of Red Cedar violated their fiduciary duties of candor, care and loyalty to Red Cedar.

124.    Red Cedar was injured and suffered damages of not less than $2.0 million dollars in payment of incentives and salaries as a result of Rajesh's and Rusty's breaches of fiduciary duties.

### SIXTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
### (ACCOUNTING)

125.    Plaintiffs repeat their allegations in Paragraphs 1 through 124.

126.    Upon information and belief, from 2011 through July 2019, Defendants charged Red Cedar, Eagle, Buffalo, Walga, Modoc MTE, and Talon and accrued and noted in  Defendants' books and records, personal accounts, and bank statements payments they claimed were due to them and/or were paid to them for salaries, fees, incentives, profits and interest pursuant to SMS's

2010 and 2014 Management Services Agreement, SFS's Non-Recourse Notes issued to Red Cedar, Eagle and Buffalo, and Rajesh's and Rusty's employment agreements with Red Cedar and Talon.

127.    Defendants' accruals and payments of fees, incentives, profits and interest were false and fraudulent and were used by Defendants to defraud and deceive the Tribe, Red Cedar and the MTE's and fraudulently take money from them.

128.    Rajesh's and Rusty's salary payments are forfeitable to Red Cedar as a result of their breaches of fiduciary duty.

129.    The Modoc Tribe and Red Cedar are entitled to and demand an accounting from Defendants of all salary payments, fees, incentives, profits and interest they accrued and/or paid to themselves pursuant to the aforementioned Management Services Agreement, Non-Recourse Notes and employment agreements and in violation of their fiduciary duties and as a result of their fraud and deceit.

130.    The Modoc Tribe and Red Cedar have no adequate remedy at law to obtain such relief and hereby demand an equitable remedy of accounting against Defendants.

## SEVENTH CLAIM FOR RELIEF
## (PUNITIVE DAMAGES)

131.    Plaintiffs repeat their allegation in Paragraphs 1 through 130.

132.    Defendants' fraudulent and deceitful conduct was carried out for a period of nine years, profited them with more than $13.5 million dollars, was malicious, knowing and intentional and in reckless disregard of the Tribe's and Red Cedar's rights.

133.    As a result of Defendants' conduct as alleged herein, the Modoc Tribe and Red Cedar should be awarded punitive damages pursuant to Section 23-9.1 of twice the amount of actual damages, or $27.0 million dollars.

**PRAYER FOR RELIEF**

**WHEREFORE,** The Modoc Tribe prays for a judgment against Defendants, jointly and severally, for damages in the following amounts or such other amounts as may be proved at trial:

A.      Compensatory and Actual Damages of not less than $13.5 million dollars;

B.      Punitive Damages of $27.0 million dollars; plus

C.      Attorney's fees, interest and costs; and

D.      Such other and further relief as may be just and proper.

Dated November 1, 2019.

Respectfully submitted,

By:     s/ Charles D. Neal, Jr.
         Charles D. Neal, Jr., OBA #6591
         cdn@steidley-neal.com
         Richard W. Wassall, OBA #10512
         rww@steidley-neal.com
         Stacie L. Hixon, OBA #19477
         slh@steidley-neal.com
         Clark W. Crapster, OBA #22112
         cwc@steidley-neal.com
         STEIDLEY & NEAL, P.L.L.C.
         CityPlex Towers, 53rd Floor
         2448 East 81st Street
         Tulsa, OK 74137
         918-664-4612 telephone
         918-664-4133 facsimile

         And

         James E. Nesland
         Law Offices of James E. Nesland, LLC
         14252 E. Caley Avenue
         Aurora, CO  80016
         (303) 807-9449
         JENesland@comcast.net

         *ATTORNEYS FOR PLAINTIFFS*

26