# United States District Court

## for the Northern District of Oklahoma

---

Case No. 19-cv-588-JDR-JFJ

---

MODOC NATION *also known as* MODOC TRIBE OF OKLAHOMA;
RED CEDAR ENTERPRISES, INC.; EAGLE TG, LLC; BUFFALO
MTE, LLC; TALON MTE, LLC; MODOC MTE, LLC; WALGA
MTE, LLC,

*Plaintiffs/Counterclaim Defendants*,

*versus*

RUSTY BOHL,

*Defendant, and*

RAJESH SHAH; SHARAD DADBHAWALA; SOFTEK MANAGEMENT
SERVICES, LLC; SOFTEK FEDERAL SERVICES, LLC; SOFTEK
SOLUTIONS, INC.,

*Defendants/Counterclaimants,*

*versus*

BLAKE FOLLIS; TROY LITTLEAXE; LEGAL ADVOCATES FOR IN-
DIAN COUNTRY LLP,

*Counterclaim Defendants.*

---

## OPINION AND ORDER

---

The Plaintiffs allege that Defendants Rashesh Shah, Sharad Dadbha-
wala, and Rusty Bohl violated the Racketeer Influenced and Corrupt Organi-
zations Act, 18 U.S.C. § 1962(b), (c) & (d), by engaging or conspiring to en-
gage in a pattern of racketeering activities in connection with their manage-
ment, operation, and control of Softek Solutions, Inc., Softek Management

Case No. 19-cv-588

Services, LLC, and Softek Federal Services, LLC. Dkt. 29 at ¶¶ 98-135.[1] De-
fendants ask this Court to dismiss the three RICO claims and a perceived
claim for outrage[2] arguing that Plaintiffs' amended complaint fails to set forth
sufficient facts to state a claim for relief, fails to satisfy RICO's specific plead-
ing requirements, fails to establish either an association-in-fact or a pattern of
racketeering activity, and fails to establish the control of an enterprise through
acts of racketeering. Dkt. 75. After considering the motion, Plaintiffs' re-
sponse [Dkt. 130], and Defendants' reply [Dkt. 131],[3] the Defendants' motion
is GRANTED IN PART and DENIED IN PART.

I.[4]

Plaintiffs' amended complaint sets forth the following allegations: In
July 2010, Rashesh Shah, Sharad Dadbhawala, and Rusty Bohl (the "Individ-
ual Defendants") met with the Modoc Nation's Chief and Tribal Council and
encouraged them to invest in Softek,[5] a consortium of companies that would

---

[1] Plaintiffs have also asserted six state-law claims that are not at issue here. *See* Dkt.
29 at ¶¶ 136-177.

[2] Plaintiffs have disclaimed any intent to assert a claim for outrage. Dkt. 130 at 44
n.13.

[3] The Court initially indicated it would convert the motion to a motion for summary
judgment under Federal Rule of Civil Procedure 56 and ordered Defendants to supplement
their motion, which Defendants did. Dkts. 79, 89. After the initial round of responsive brief-
ing was filed, however, the Court reconverted the motion to one for dismissal, struck docu-
ments filed in support of the converted motion, and permitted the parties to submit substi-
tute briefs. Dkt. 119. The parties submitted their responsive briefing in accordance with the
Court's Order. *See* Dkts. 130, 131. It is these briefs, together with the original motion, that
the Court considers in its analysis.

[4] The following discussion summarizes the allegations as they are set forth in the
amended complaint. The Court does not adopt the facts as recited but accepts them as true
solely for purposes of addressing Defendants' motion. *See Casanova v. Ulibarri*, 595 F.3d
1120, 1124 (10th Cir. 2010).

[5] The Softek entities include Softek Solutions, Inc., a California corporation; Softek
Federal Services, LLC, a California limited liability company whose sole member is Softek
Solutions; and Softek Management Services, LLC, a California limited liability company
whose sole member is Softek Federal Services. The three entities are referred to collectively
as "Softek."

(a) invest in, manage, and finance Red Cedar Enterprises, Inc., an entity owned by the Tribe and chartered under the Tribe's constitution, and (b) form, invest in, manage, and finance other entities that would be owned by the Tribe. *Id.* at ¶¶ 3, 8, 31. The entities created by Softek would qualify as economically disadvantaged companies under § 8(a) of the Small Business Act, 15 U.S.C. § 637(a), and would be eligible for government and commercial contracts that would provide financial resources for the Tribe and its members. *Id.* at ¶¶ 3, 31. When the Tribe expressed an interest in this proposal, the Individual Defendants drafted a letter of intent dated August 16, 2010, and signed by Softek Services. *Id.* at ¶ 32. The letter of intent proposed that Softek purchase a 49% interest in Red Cedar, share in 49% of Red Cedar's profits, and receive a 40% management fee. *Id.*

In the months that followed, the Individual Defendants allegedly made a series of false representations regarding what Softek had to offer, including: Softek Management Services' ability to provide management personnel and infrastructure necessary to manage tribal entities; Softek Federal Services' ability to provide all financing necessary to fund the Tribal Entities' businesses and projects; and Softek Solutions' ability to provide information technology consulting and expertise necessary to perform government contracts. *Id.* at ¶ 34. Unbeknownst to Plaintiffs, neither Softek Management Service nor Softek Federal Services existed at the time the representations were made, and Softek Solutions was a small company with two employees, minimal capital, and limited-to-no experience providing information technology consulting services. *Id.* at ¶ 35. In addition, Plaintiffs were not informed that a fraud dispute had arisen with respect to profits awarded to an investor in another Section 8(a) company managed and controlled by Mr. Shah. *Id.* at ¶¶ 2, 3, 26, 27, 33.

The Tribe and Red Cedar relied on the representations and entered a series of agreements signed by Mr. Shah on behalf of Softek Entities in December 2010. *Id.* at ¶ 36. One of those agreements, a Management

Agreement, included assurances regarding the services to be provided by Softek Management Services. *Id.* at ¶ 37. Plaintiffs claim that they relied on these assurances and that the Individual Defendants had no intention of carrying out the assurances when they were made. *Id.* at ¶ 38.

The December 2010 agreements were subject to, and effective only upon, SBA approval. *Id.* at ¶ 41. When Mr. Shah determined that approval was not forthcoming, he proposed a new arrangement under which Defendants would manage, finance, and develop the businesses of Red Cedar and new Section 8(a) entities in exchange for a 40% management fee. *Id.* at ¶ 42. Unbeknownst to Plaintiffs, Mr. Shah intended to adopt, and later did adopt, an incentive plan that resulted in Softek being paid more than the agreed-upon fee. *Id.* at ¶¶ 42-43.

Beginning in or around January 2012, Defendants worked to expand Red Cedar and increase the number of tribal entities operated by the Tribe. Among other things, Defendants registered Red Cedar as an information technology provider, hired a consultant for Red Cedar who procured a $20 million contract for that entity,[6] and formed several limited liability companies owned and controlled by the Tribe.[7]

Plaintiffs claim that the Individual Defendants engaged in extensive fraudulent conduct through and in connection with the Tribal Entities. Specifically, Plaintiffs claim that the Individual Defendants fraudulently requested and received fees paid out of the profits of the Tribal Entities and

---

[6] According to Plaintiffs, Mr. Shah executed a consulting contract with Mr. Cool in which Red Cedar agreed to pay Mr. Cool a 20% commission; the commission was never paid. Dkt. 29 at ¶ 48.

[7] These entities are: Eagle TG, LLC, a Texas limited liability company; Buffalo MTE, LLC, a Utah limited liability company; Talon MTE, LLC, a Texas limited liability company; Modoc MTE, LLC, a limited liability company organized under the laws of the Modoc Tribe; and Walga MTE, LLC, a Kansas limited liability company (collectively the "Tribal Entities"). Dkt. 29 at ¶¶ 8-13, 45-55. The Tribe is the sole member of each of the Tribal Entities.

used those entities to conceal the amount of money they had received [*id.* at ¶¶ 45-55]; made and retired loans to the Tribal Entities, then demanded that the Tribe repay loan balances and fees that had either been retired or were not due [*id.* at ¶¶ 56-66]; implemented an accounting method through which the Defendants caused the Tribal Entities to finance one another (rather than receive financing from Softek) [*id.* at 67-69]; and treated inter-entity loans as transfers of funds, rather than debts to be paid [*id.*].

Plaintiffs also claim that Mr. Shah caused the Tribe to sign a 2014 Corporate Management Services Agreement suggesting that Softek would continue to provide business development and management services, loans, and financing, when Defendants had no intention of doing so. *Id.* ¶¶ 70-81. Plaintiffs further assert that Mr. Shah set up a fee transfer and distribution scheme whereby Defendants fraudulently charged for management and financing services, failed to accurately describe the amounts due as management and financing fees, caused fees paid to Softek to be undisclosed and unreported on the Entities' 2014-2018 financial statements, and used the fee formula in the Corporate Management Services Agreement to retroactively accrue $1.2 million in fraudulently booked fees—all without providing the promised management and financing services. *Id.*

In addition to the foregoing, Plaintiffs assert that the Individual Defendants failed to provide transparent reports of profit distributions and fees paid to Softek. *Id.* at ¶ 82. They further assert that the Individual Defendants withheld key information concerning profits and fees taken from the Tribal Entities and transferred to themselves, drew from a line of credit under false pretenses, and failed to repay the amounts drawn from the line of credit and paid to Softek. *Id.* at ¶¶ 82-97. Plaintiffs allege that, in connection with the aforementioned conduct, the Individual Defendants engaged in discrete acts of wire fraud (including transmitting false communications and invoices in interstate commerce for purposes of executing their scheme and causing fraudulently induced payments to be made through interstate wire

transactions); money laundering (including engaging in transactions involving money taken by fraud and in order to conceal and disguise the nature of the criminally derived payments); transferring and receiving money taken by fraud; bank fraud (including obtaining money and funds by means of false and fraudulent pretenses); and obstruction (arising out of the removal of electronic data relevant to Softek from Mr. Bohl's computer). *Id.* at ¶¶ 108-121.

Plaintiffs contend that the alleged actions, which were taken in the course of the Individual Defendants' scheme to manipulate and defraud Plaintiffs, caused damages to Plaintiffs in excess of $13 million. *Id.* at ¶¶ 122-35. Plaintiffs also claim that the Individual Defendants' conduct "presents the potential to injure other potential persons or entities," and that Plaintiffs are "only several of many victims in a continuing string of racketeering activity" that threatens to injure additional unidentified victims. *Id.* at ¶ 125.

## II.

Plaintiffs assert three separate RICO claims pursuant to 18 U.S.C. § 1962(b), (c), and (d). Each of these subparagraphs prohibits unique conduct: Subparagraph (b) prohibits acquiring or maintaining an interest in or control of an enterprise through a pattern of racketeering activity or collection of an unlawful debt; Subparagraph (c) prohibits anyone employed by or associated with an enterprise from conducting or participating in the conduct of that enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt; and Subparagraph (d) prohibits individuals from conspiring to violate § 1962(a), (b), or (c). 18 U.S.C. § 1962(b)-(d). Although the specific conduct prohibited by these subsections differs somewhat, they are uniform in the sense that they prohibit only conduct that constitutes a "pattern" of racketeering activity or unlawful debt collection. *See George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1248 (10th Cir. 2016); *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006) (discussing elements necessary to establish a violation of § 1962(b)-(d)). If the requisite "pattern" of wrongful conduct is not present, there is no claim for relief.

Case No. 19-cv-588

The Court begins—and ends—by considering whether Plaintiffs have satisfied their burden of alleging facts that, if true, would establish a "pattern" of racketeering activity, which is an essential element of each of their RICO claims. *See Tal*, 453 F.3d at 1269 (recognizing that, to survive a motion to dismiss, a civil RICO claim must allege, among other things, a pattern of racketeering activity). While "[d]etermining what constitutes a RICO pattern is no easy task," it is clear that, at a minimum, a RICO pattern requires multiple "racketeering predicates" that "relate to each other and amount to a threat of continued racketeering activity." *Johnson v. Heath*, 56 F.4th 851, 858 (10th Cir. 2022) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). "No pattern exists without this 'continuity plus relationship.'" *Id.* at 859 (quoting *H.J. Inc.*, 492 U.S. at 239).

It is not a cumbersome task to establish that one or more predicate racketeering acts are related; it is enough to show that the alleged predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated" and are not isolated events. *Id.* (quoting *H.J. Inc.*, 492 U.S. at 240). Plaintiffs have adequately alleged that the predicate acts of wire fraud, money laundering, transferring money taken by fraud, and bank fraud are "related" in the sense that they were carried out as part of, or in pursuit of, the Individual Defendants' broader scheme to extract more money from Plaintiffs than they were owed. *See* Dkt. 29 at ¶¶ 108-120. This is sufficient to establish that the alleged predicate acts are "related" to one another. *Johnson*, 56 F.4th at 859 (concluding that acts of fraud were related to one another because they were "part of a broader scheme" to sell a gas station at an inflated price).

More difficult to establish—and more problematic for Plaintiffs—is the requirement that the predicate acts have sufficient "continuity" to constitute a RICO "pattern." *See Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010) (indicating that the continuity requirement "is more difficult to meet" (citation and quotation marks omitted)). For RICO purposes, continuity

Case No. 19-cv-588

comes in one of two forms: Closed-ended continuity can be established by alleging a "closed period of repeated racketeering conduct." *Johnson*, 56 F.4th at 859-60 (citing *H.J. Inc.*, 492 U.S. at 241-43). Open-ended continuity can be established by racketeering acts that "involved implicit or explicit threats of repetition," "formed the operations of an association that exists for criminal purposes," or were part of the defendants' "regular way of conducting a legitimate enterprise." *Id.* (citing *H.J. Inc.*, 492 U.S. at 241-43). A plaintiff who cannot establish one of these two forms of continuity cannot state a viable claim under RICO. *E.g., Bixler*, 596 F.3d at 761 (affirming dismissal where the complaint failed to allege either the closed-ended or open-ended continuity of predicate acts required to form a RICO pattern).

The Tenth Circuit addressed the continuity requirement in *Johnson v. Heath*, 56 F. 4th 851. In that case, the plaintiff alleged that the defendants scammed at least twenty-four customers by making misrepresentations regarding the price of gasoline and fraudulently overcharged twenty-five more customers—all in an attempt to inflate the station's profits and sell the station to the plaintiff at an artificially high price. *Id.*

The court rejected the plaintiff's contention that open-ended continuity was established by the alleged "burn-the-station" scheme. Although the defendants had purportedly engaged in fraudulent sales at two other gas stations, there was no allegation that the improper sales at those stations were connected to similar schemes at those locations; thus, the court concluded, the allegations did not demonstrate that the defendants regularly engaged in "burn the station" schemes, nor did they suggest that the defendants would engage in similar schemes in the future. *Id.* Absent any threat of future repetition, there was no open-ended continuity. *Id.* at 860.

The court also rejected the plaintiff's claim that his allegations established closed-ended continuity. *Id.* at 860-61. In reaching this conclusion, the court considered both "the duration of the related predicate acts and the extensiveness of the racketeering scheme"—the latter of which included an

Case No. 19-cv-588

assessment of the number of victims, the number and variety of predicate acts, whether the injuries were distinct, the complexity and size of the scheme, and the nature and character of the enterprise. *Id.* at 860, 861 (citing *United States v. Smith*, 413 F.3d 1253, 1271–72 (10th Cir. 2005)) (footnote omitted). Although the purported scheme took place over a period of years, the court noted that "duration alone may not establish closed-ended continuity." *Id.* at 860. And while the court recognized that fifty predicate acts and fifty alleged victims ***could*** suggest an extensive scheme, the remaining factors pertinent to the extensiveness analysis supported the contrary conclusion: The defendants had "burned" only a single station; and the predicate acts, which were similar, were part of a single scheme with a discrete goal. *Id.* at 861-62. After considering all the extensiveness factors together, the court affirmed the dismissal of the RICO claims, which were more akin to a "business deal gone sour" than the type of long-term criminal activity that RICO was designed to address. *Id.* at 862.

The Tenth Circuit's analysis in *Johnson* precludes a finding of open-ended continuity in this case. According to the amended complaint, the Individual Defendants' scheme to deceive and fraudulently obtain money they were not entitled to had a single target: Plaintiffs. Although Plaintiffs vaguely reference other victims in their amended complaint,[8] they, like the plaintiff in *Johnson*, have failed to provide any allegations linking the actions taken against those victims to the fraudulent invoicing/charging scheme set forth in their pleading. *Cf. Johnson*, 56 F.4th 860. Because Plaintiffs "failed to connect" the other misconduct to a fraudulent invoicing/charging scheme similar to the one allegedly perpetrated against them, they have failed to allege that the conduct described in the amended complaint "presents [the Individual] Defendants' regular way of conducting business or that it threatens

---

[8] *See* Dkt. 29 at ¶¶ 2-3, 26-28, 125.

Case No. 19-cv-588

future repetition," and have failed to demonstrate the existence of open-ended continuity. *Id.*

The decision in *Johnson* also precludes a finding of closed-ended continuity based on the facts alleged. Plaintiffs, like the plaintiffs in *Johnson*, have described a series of predicate acts that took place over a multi-year period. *See* Dkt. 29 at ¶¶ 108-121 (describing over forty predicate acts).[9] But the "duration alone" does not, by itself, "establish closed-ended continuity"—the Court must also consider the extensiveness of the scheme. *Johnson*, 56 F.4th at 860. The scheme at issue here had a singular focus with a singular goal—defrauding Plaintiffs. There is no suggestion that the scheme will, or could, continue. This weighs against a finding of continuity. *Id.* at 862 (recognizing that "a single scheme rarely supports finding continuity," and is even less likely to do so where the scheme has a single, discrete goal). Furthermore, by Plaintiffs' own admission, all of the predicate acts specifically described in the Amended Complaint were carried out with the singular objective of defrauding Plaintiffs. *See* Dkt. 29 at ¶¶ 108, 118, 121 (describing acts carried out as part of the "scheme to defraud Plaintiffs"); *id.* at ¶¶ 117, 120 (describing actions taken to perpetrate the "scheme to defraud"). These predicate acts "were all similar and amounted to a single, noncomplex scheme with a discrete goal." *Johnson*, 56 F.4th at 862. The commonsense conclusion—and the conclusion compelled by *Johnson*—is that the amended complaint alleges, at most, a "business deal gone sour" and "various other torts," rather than a series of predicate acts with sufficient closed-ended "continuity" to constitute a RICO "pattern." *Id.* (quoting *Sil-Flo*, 917 F.2d at 1516). Accordingly, Plaintiffs' RICO claims must be dismissed for failure to state a viable claim for which relief may be granted.

---

[9] The Court assumes, without deciding, that the acts set forth in these paragraphs constitute predicate racketeering crimes.

Case No. 19-cv-588

### III.

The amended complaint fails to demonstrate a "pattern" of racketeering activity—an essential element of Plaintiffs' RICO claims. Accordingly, Defendants' motion is GRANTED IN PART with respect to the RICO claims. Because Plaintiffs have disclaimed any intent to assert a claim of outrage, the motion is DENIED IN PART as MOOT with respect to the outrage claim.

DATED this 30th day of October 2024.

JOHN D. RUSSELL
*United States District Judge*